**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| BIOFUNCTION, LLC | ) | |
| | ) | |
| Plaintiff, | ) | No. 07-67C |
| | ) | (Hon. Robert H. Hodges, Jr., Judge) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

BIOFUNCTION'S RESPONSE TO STATUS CONFERENCE ORDER

Plaintiff, Biofunction, LLC ( "Biofunction") responds to the questions posed by the Court as follows:

1.

**a. Does the written contract dated February 8, 2005 vary from plaintiff's alleged responsibilities in accordance with the October 4, 2004 contract?**

**Short Answer**

The February 8, 2005 agreement was not a separate contract. It is an extension and modification to the contract entered into between the parties on May 15, 2003. The February 8, 2005 agreement extended the performance period of the contract through April 30, 2005 for both Biofunction and USPS.[1]

In September and October 2004, while Biofunction was performing services pursuant to the May 15, 2003 contract as extended and modified by the January 2004 contract, USPS contacted Biofunction and requested additional services. On or about

[1] The February 8, 2005 contract describes the modification as: ERGO WIZARD – SACRAMENTO DISTRICT, ADMINISTRATIVE SUPPORT, WEST SACRAMENTO, CA 95799-0080" and provides: "Period of Performance: 5/14/03 to 4/30/05" and states "THIS MODIFICATION IS ISSUED TO EXTEND PERIOD OF PERFORMANCE THROUGH APRIL 30, 2005. ADDITIONAL FUNDS OF $90,000 WILL BE ADDED TO SUBJECT CONTRACT."

October 4, 2004, USPS and Biofunction agreed on terms, Biofunction would provide additional services. In exchange, USPS provided assurances to Biofunction that it would pursue the job offers made using the ErgoWizard generated hits to resolution. The agreement anticipated Biofunction would complete the additional services requested by the USPS by December 2004 and that USPS would obtain resolution of the job offers in that time. The extension of the contract by four months in February 2005 recognized that administrative support was provided in addition to the ErgoWizard hits and was executed to allow Biofunction's administrative services to be completed; it also served to allow the USPS to complete processing the job offer appeals. When the modification was issued in February 8, 2005, it operated as a ratification of the USPS's October agreement.

**Summary of the Contract Modifications**

On May 15, 2003 the USPS entered into a contract with Biofunction. In the May 15, 2003 contract, USPS agreed to pay a licensing fee to Biofunction for the use of the ErgoMatch/ErgoWizard software application to match employer job tasks to an employee's medical restrictions. The May 15, 2003 contract provided for a guaranteed 3,000 hits (license fees) to use the ErgoMatch/ErgoWizard software at a cost of $340,800. The contract also provided an option for $260 per participant for additional training and an option to include the Phoenix and Las Vegas District for additional set up fees of $7,500.00.

The January16, 2004 contract extended the time period of the license and provided an additional guaranteed number of ErgoMatch/ErgoWizard software hits through December 31, 2004 for a price of $249,900. The January contract also provided pricing on a per hit basis for additional hits if the software usage exceeded the guaranteed number allowed under the fixed price.

In September and October of 2004, the USPS found that in the past year it had not used the ErgoMatch/ErgoWizard services available at their optimal level and requested that Biofunction provide administrative support to the Sacramento District by providing additional services to aid in putting the "hits" to use. In other words, once a job fitting an employee's medical restrictions was identified using Biofunction's ErgoMatch/ErgoWizard software, the USPS wanted Biofunction to perform administrative support and analysis to assist in placing the employee in the job. The USPS requested that Biofunction assist with making job offers, assist with locating appropriate evidentiary medical examiners, conduct its own ergonomic evaluation of the employee using its specialized ergonomic testing equipment and prepare rebuttal letters responding to employee objections to job offers made. To induce Biofunction to perform these additional services, USPS agreed that it would identify appropriate hits for job offers and would follow a prescribed number of "hits" from the job offer to resolution of any employee dispute over the job offer. Once an agreement had been reached, a specialized team was formed by the USPS to work with Biofunction on these additional tasks. The USPS provided office space and arranged for Biofunction to provide both training and informational meetings regarding the work that Biofunction was performing.

**b. Does the parol evidence rule apply?**

**<u>Short Answer</u>**

Analysis of the issue of the October 2004 agreement as a modification of the written agreement leads to the conclusion that the negotiations and discussions of the

parties contemporaneous with the agreement are admissible to explain the term "administrative services" in the modification of February 8, 2007.

Analysis of the October 2004 agreement as an implied-in-fact contract does not preclude the admission of parol evidence to interpret or explain the terms of the agreement. The admission of the evidence of the acts of the parties to perform the acts promised for the implied-in-fact contract would not be precluded by the parol evidence rule.

**Analysis**

The parol evidence rule is a term that commentators have noted encompasses many different concepts. Wigmore has asserted that there are several distinct propositions involved in the parole evidence rule, including the following (see 9 Wigmore (Chadbourn Rev.) §2401):

> (a) A rule determining whether there was a valid legal act.
>
> (b) The "integration" rule, determining whether that act was intended to supersede all other negotiations and constitute the complete expression of the intentions of the parties.
>
> (c) A rule relating to the interpretation of the act.
>
> (d) A rule of solemnization or form, e.g., the statute of frauds.

The parol evidence rule is a rule of substantive law that "prohibits the use of external evidence to add to or otherwise modify the terms of a written agreement in instances where the written agreement has been adopted by the parties as an expression of their final understanding." *Stockton East Water Dist. v. U.S.* 70 Fed.Cl. 515, 532 (Fed.Cl.,2006), citing, *David Nassif Assoc. v. United States.*, 214 Ct.Cl. 407, 419-420, 557 F.2d 249 (1977). The chief question is therefore, whether extrinsic evidence is or is

not admissible in a particular case. In responding to this question, the following questions are asked:

> (a) Is the writing one to which the rule applies, i.e., an integration? *Brawley v. United States* (1877) 96 U.S. 168, 13 Ct.Cl. 521
>
> (b) Was the extrinsic evidence admissible because it was not inconsistent with the writing? *Pacific Gas & Elec. Co. v. U.S.* 73 Fed.Cl. 333, 384 (Fed.Cl.,2006)[evidence of industry practice allowed to interpret potential ambiguity and to understand the circumstances of the contract]; see also *Sylvania Elec. Products, Inc. v. U. S.* 458 F.2d 994, 1007 (Ct.Cl.,1972)
>
> (c) Was the extrinsic evidence admissible, though inconsistent, under one of the exceptions to the rule? *Pacific Gas & Elec. Co. v. U.S.* 73 Fed.Cl. 333, 384 (Fed.Cl.,2006)

> The parol evidence rule states that, "[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing."

*Pacific Gas & Elec. Co. v. U.S.* 73 Fed.Cl. 333, 384 (Fed.Cl.,2006) citing, 6 Arthur L. Corbin, *Corbin on Contracts* § 573 (rev. ed.2005).

> "[T]he parol evidence rule bars the use of evidence prior to or contemporaneous with contract formation, but "not evidence of events subsequent to the writing that is claimed to be the statement of the parties' contract." *In re Vic Supply Co., Inc.*, 227 F.3d 928, 930-31 (7th Cir.2000); *see also Fischer v. First Chi. Capital Mkts., Inc.*, 195 F.3d 279, 282 (7th Cir.1999) (stating substantially the same); *Burlesque Artists Assoc. v. I. Hirst Enter., Inc.*, 267 F.2d 414, 416 (3d Cir.1959) (refusing to apply the parol evidence rule to bar testimony regarding an agreement because it "did not ... change the promises in the original contract but simply implemented the execution of those promises," and because it was made "subsequent to the execution of [the] contract"); *First Allmerica Fin. Life Ins. Co. v. Minn. Life Ins. Co.*, 188 F.Supp.2d 101, 107 (D.Mass.2002) "

*Pacific Gas & Elec. Co. v. U.S.* 73 Fed.Cl. 333, 384 (Fed.Cl.,2006)

In this matter, the agreement in October 2004 of the USPS to receive the additional services of Biofunction in exchange for the services of Biofunction is not

inconsistent with the writings of May 2003 or January 2004. The claimed agreement of October 2004 does not vary any of the terms of the agreements because it is an agreement subsequent to the original agreement or its modification in January 2004. The terms of the agreement are also consistent with the modification of February 8, 2005 which adds the reference to Biofunction's administrative support to the Sacramento District to the description of the contract. The basic service and the price for the services continue in effect. The assumption of the parties was that the value of completing the job offers would compensate Biofunction in major part for the additional expense of its services rendered to the USPS. In matters of interpretation, the parol evidence rule does not exclude evidence of the parties' interpretation of the agreement or of subsequent changes to the agreement. *Pacific Gas & Elec. Co. v. U.S.* 73 Fed.Cl. 333, 384 (Fed.Cl.,2006)

2.

**a. Does the plaintiff allege that the extra work completed resulted from discussions with an authorized person prior to signing the new contract on February 8, 2005?**

An answer to this question again begs the issue of whether a "new contract" was entered into between the parties.

The termination expenses claimed by Biofunction were incurred after the October 4, 2004 verbal agreement and before termination for convenience of the February 8, 2005 extension.

The February 8, 2005 contract was not intended as a "new contract" but as a modification and extension of the prior agreement. The execution of the February 8, 2005 agreement ratifies the agreement of the USPS to complete the project. The extra work completed was performed after the October 2004 agreement and continued through February 7, 2007. This work was performed in accordance with the USPS request for

additional support. It was not completed at the time of the termination of the February 8, 2005 contract nor had the USPS completed its side of the bargain, USPS had not reached final resolution of the job offers designated by the parties. The termination expenses for services rendered by Biofunction which are claimed in this action were performed in furtherance of their October 2004 agreement with the USPS. This October 2004 agreement was ratified when the contract was modified on February 8, 2005.

**b. Does the plaintiff allege that the extra work completed resulted from discussions with an authorized person prior to signing the new contract on February 8, 2005? If so, please name the authorized person.**

Biofunction is informed and believes that the authorized persons who participated in the meetings, requested the additional work and agreed to the scope of the job offer follow-up include: Ron Henderson, Kevin McGovern, Al Iniquez, Jerry Sanchez, Gary Emich, David Bachman, M.D., Rosemary Fernandez, Tom McCue, and Victor Orr. The agreement reached with these persons was ratified by Rey Pulido on February 8, 2005.

Biofunction has sought discovery on the issue of the authorization of these persons and any additional authorized persons who were involved in this agreement.

**a. Is this a Contracts Disputes Case?**

Yes. Clause B-9 to the contract states, in pertinent part:

> a. This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601-613) ("the Act").
>
> b. Except as provided in the Act, all disputes arising under or relating to this contract must be resolved under this clause.

This dispute was initially submitted to the USPS on May 22, 2006 as a Contracts Disputes case. The USPS failed to act on the claim within the required time, therefore,

this action has been brought on behalf of Biofuction to obtain a determination of its rights under its agreements with the USPS.

**b. If so, can plaintiff prove an implied in fact contract? Discuss the differences or similarities between the work required by each alleged contract.**

The plaintiff can prove that an implied in fact contract that covered a different scope of work than the express contract was entered by the USPS.

The express contract was for a certain number of "hits" to be generated by the Biofunction system for matching employees' functional capabilities with jobs providing productive work for the USPS. Biofunction can prove that the subject matter of its alleged implied-in-fact contract, was substantially different. The USPS requested that Biofunction provide services beyond the "hits":

Biofunction was requested to prepare job offers to the employees for whom jobs had been identified. Biofunction was requested to and performed additional services to identify medical providers and to arrange for evidentiary medical examinations for employees. Biofunction was requested to and performed additional services by preparing letters responding to employee objections to job offers.

Based on the facts of this matter, an implied-in-fact contract can be proven.

The USPS received the services of Biofunction. It provided Biofunction with office space, it conferred and consulted with Biofunction regarding the assessment of work assignments and the evaluation of functional limits for its employees.

When the termination for convenience was elected by USPS, Biofunction was left in the position of having provided services for the USPS for which it received no compensation. The project was not completed due to termination of the contract. The

consideration for which Biofunction had bargained does not exist. The expenses that Biofunction incurred to render services to USPS were not reimbursed.

Compensation for those services may be obtained either as termination costs or quantum meruit for an implied-in-fact contract. *Baltimore & O.R. Co. v. U.S.* 261 U.S. 592, 597, 43 S.Ct. 425, 426 - 427 (U.S.1923).

> “Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a quantum valebant or quantum meruit basis.... The contractor is not compensated under the contract, but rather under an implied-in-fact contract.”

*Farmers Grain Co. of Esmond v. U.S.* 29 Fed.Cl. 684, 687 (Fed.Cl.,1993)

In the case of *Farmers Grain, Co.* the court determined that the grain storage contract entered by the United States had expired. However, because it continued to store grain at the facility for months later, the Court of Claims determined that the United States had an implied-in-fact contract with the grain storage facility and was required to pay storage fees at the contract rate despite the . *Id*.

Similarly, where the USPS terminated a contract for a 10-year term to use pneumatic tubes after three years, it was found to be liable to the manufacturer for additional expenses the manufacturer incurred installing and maintaining the pneumatic tubes in the post office for the first three years of the contract. *New York Mail & Newspaper Transp Co. v. U. S.* 154 F.Supp. 271, 276 (CT.CL. 1957) cert den. 355 U.S. 904, 78 S.Ct. 332, (1957)

> ‘We do not mean to say that, where a parol contract has been wholly or partially executed and performed on one side, the party performing will not be entitled to recover the fair value of his property or services. On the contrary, we think that he will be entitled to recover such value as upon an implied contract for a quantum meruit.'

> Here, as there was bona fide purpose to render services to the United States, as agreed to by the Postmaster General, we think the parties should be put substantially in the position they would have occupied without the attempted contract rather than a strict quantum meruit.

*New York Mail & Newspaper Transp Co. v. U. S.* 154 F.Supp. 271, 276 (CT.CL. 1957) cert den. 355 U.S. 904, 78 S.Ct. 332, (1957)

In this case, the contract for computer job matching services in the original written contract is distinct from the administrative support services provided by Biofunction. The computer matching service consisted of the USPS' use of the ErgoMatch/ErgoWizard software to input the medical restrictions of employees to obtain "hits" a match of the employee with jobs that could best be performed with the medical restrictions of the employee.

The USPS requested that in addition, to licensing the use of software to obtain the hits provided under contract, that Biofunction assist USPS in the administrative work of making job offers to selected employees, assisting with locating appropriate evidentiary medical examiners, conducting its own ergonomic evaluation of the employees using its specialized ergonomic testing equipment, and preparing rebuttal letters controverting any employee rejections of job offers made. The services requested by the USPS from Biofunction were not included in the original contract and are separate and distinct from the computer software license provided under contract.

The USPS was closely involved in Biofunction's services. It had notice of the services provided. The USPS encouraged Biofunction to continue to provide its services. The USPS promised Biofunction that it would commit to following the job offers to resolution in compensation for the administrative support services of Biofunction. The contract has been performed by Biofunction with the knowledge, acquiescence and

ratification by representatives with authority to bind the USPS. Therefore, Biofunction seeks recovery from the USPS on the theory of implied in fact contract.

3.

**a. What is the status of Counts I – III?**

Count I (First Cause of Action for Breach of Contract) is a claim for breach of contract made on the grounds that the Government has breached its contractual obligation to pay the termination costs incurred as a result of the additional mobilization of Biofunction required by USPS as a result of the October 2004 modification to the contract.

Count II (Second Cause of Action for Breach of Covenant of Good Faith and Fair Dealing) is a claim that the USPS failed to perform the acts promised to Biofunction which were necessary to provide Biofunction with the results that it was promised in exchange for the additional administrative support services demanded by USPS. USPS failed to distribute job offers in a timely manner and failed to take appropriate administrative action to resolve rejections of job offers and failed to contest rejections of the job offers. USPS breached its covenant of good faith and fair dealing by inducing Biofunction to provide additional services while USPS delayed performance of the promised actions until Biofunction had incurred expenses

Count III (Third Cause of Action for Breach of Covenant of Cooperation) is a claim that the USPS failed to cooperate in the performance of the October 4, 2004 agreement in that it failed to perform the aggressive implementation of the cost containment program, that breached the contract with Biofunction by failing to contest its employees' rejection of job offers, by unreasonably delaying the making of job offers, and refusing to require its employees attend "fitness for duty examinations". This caused

Biofunction to incur undue expense in performing the additional services demanded by the Government.

**b. If this is a termination for convenience, can the Government be held liable for the breaches alleged in Counts I – III?**

Yes, the breach of contract claims are alleged in the alternative. Government has refused to pay termination expenses to Biofunction. This refusal is a breach of its contractual obligation to pay termination expenses.

The breach of each obligation is alleged separately and in the alternative to each other and to the implied-in-fact contract.

**c. Do counts I – III apply solely to the February 8, 2005 contract?**

No

As stated in the responses to the first three questions, the contract was originally entered on May 16, 2003 and has been modified. The last modification of the contract was February 8, 2005. The period for performance of the contract as last modified extended from May 15, 2003 to April 30, 2007. Insofar as it is alleged that the contract was modified to include the additional services requested by the USPS and that the modification was later ratified in the written modification executed on February 8, 2005, the Government can be held liable for its breaches of contract obligations to Biofunction. *Tecom, Inc. v. U.S.* 66 Fed.Cl. 736, 774 -775 (Fed.Cl.,2005).

Date: November 1, 2007

LAW OFFICES OF DAVID W. GINN

By_s/______________________________
DAVID W. GINN
Attorneys for Plaintiff,
BIOFUNCTION, LLC

CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of November 2007, a copy of the foregoing BIOFUNCTION'S RESPONSE TO STATUS CONFERENCE ORDER was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. The parties may access this filing through the Court's system.

s/

Barbara J. Massey
Law Offices of David W. Ginn
1981 N. Broadway, Suite 275
Walnut Creek, CA 94596
Tel: (925)256-4466Fax: (925)256-4423

Attorneys for Plaintiff, Biofunction LLC